## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| MELISSA SIMPSON and SABRINA ROBERTS on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SANDERSON FARMS, INC., PERRY HAUSER, JEFF BLACK, DEMISHIA CROFT, ARISTIDES CARRLES, JANIE PERALES, KARINA FONDON, and JENNIFER HARRISON BUSTER,<br><br>Defendants. | CIVIL ACTION NUMBER<br><br>_____<br><br>JURY TRIAL DEMANDED |

### CLASS ACTION COMPLAINT

Plaintiffs Melissa Simpson and Sabrina Roberts, on behalf of themselves and all those similarly situated, by and through their undersigned attorneys, complain of Defendants Sanderson Farms, Inc., Perry Hauser, Jeff Black, Demishia Croft, Aristides Carral-Gomez, Janie Perales, Karina Fondon, and Jennifer Harrison Buster, as follows, for damages caused to them by their violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, and the Georgia RICO Act, and in support here state:

### NATURE OF ACTION

1. This is a seven count class action complaint brought on behalf of all hourly-paid workers, legally authorized to be employed in the United States, who have been employed by the Sanderson Farms, Inc. processing Facility in Moultrie, Georgia (hereafter "the Moultrie Plant" or "the Plant"), since 2008.

CLASS ACTION COMPLAINT

2.  Melissa Simpson and Sabrina Roberts (hereafter "Plaintiffs"), as representatives of the legal workers (hereafter "the Class"), allege that the Defendants have conspired to depress the Class' wages by knowingly employing large numbers of illegal aliens (likely more than 300 in the last four years) and by falsely attesting that these illegal aliens presented genuine work authorization documentation/identification documents. (This is referred to as "the Illegal Hiring Scheme" or "the Scheme.").

3.  The Scheme violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and the Georgia RICO Act, Ga. Code Ann., § 16-14-1 *et seq.* ("Georgia RICO"). The Scheme is carried out every day and will continue unabated, victimizing every legal worker, until halted by judicial intervention.

## PARTIES, JURISDICTION & VENUE

4.  Plaintiff Melissa Simpson is a citizen of Georgia. She was legally authorized to be employed in the U.S., and was an employee of Sanderson within the past four years.

5.   Plaintiff Sabrina Roberts is a citizen of Georgia. She was legally authorized to be employed in the U.S., and was an employee of Sanderson within the past four years.

6.  Defendant Perry Hauser is a citizen of North Carolina. He was the Complex Manager of the Moultrie Plant until 2011.

7.  Defendant Jeff Black is a citizen of North Carolina. He was the Assistant Plant Manager of the Moultrie Plant until 2010/2011.

8.  Defendant Demishia Croft is citizen of Georgia. She was the Human Resources ("HR") Manager at the Moultrie Plant from approximately 2008-2010.

9.  Defendant Aristides Carral-Gomez ("A.C.") is a citizen of Georgia. He is a former HR Clerk/Representative on second shift from approximately 2008-2010.

10. Defendant Janie Perales is a citizen of Georgia. She is a former HR Clerk/Representative at the Moultrie Plant until 2009.

11. Defendant Karina Fondon is a citizen of Georgia. She is a former HR Clerk/Representative at the Moultrie Plant until 2009.

12. Defendant Jennifer Harrison Buster is a citizen of Mississippi. She is the current Corporate HR Manager at the Sanderson corporate headquarters in Laurel, Mississippi.

13. Defendant Sanderson Farms, Inc. ("Sanderson" or "the Company") is a Mississippi corporation with its principal place of business in Laurel, Mississippi. Sanderson has a poultry processing facility located in Moultrie, Georgia (as well as a number of other locations in the Southeast of the U.S.). Sanderson is not a Defendant in the Federal RICO counts, but is a Defendant in at least one count of the Georgia RICO counts. As described below, Sanderson is also the RICO enterprise in the Federal RICO counts.[1]

14. This Court has subject matter jurisdiction of this case as a federal question, pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964(c). The Court also has supplemental jurisdiction of the Georgia RICO claims pursuant to 28 U.S.C. §1367, as they arise from the same facts.

15. Venue is proper in this District because the illegal acts giving rise to this case occurred in this district and the Plaintiffs reside here.

---

[1] Sanderson Farms, Inc. is not a Defendant in the Federal RICO counts. It is only a Defendant in one count of the Georgia State RICO claims. "Federal RICO Defendants" or "Individual Defendants" therefore will be used interchangeably to refer only to the named individual Defendants in the Federal RICO counts, which are Defendants Hauser, Black, Croft, A.C., Perales, Fondon, and Buster. Within the group of Individual/Federal RICO Defendants, "Plant Manager Defendants" will be used to refer to Defendants Hauser, Black, and Croft; "HR Clerk Defendants" will be used to refer to Defendants A.C., Perales, and Fondon; and "Corporate Manager Defendant" will be used to refer to Defendant Buster. Additionally, on information and belief, there are other unnamed co-conspirators who work in the corporate headquarters with Defendant Buster and who also participate, implement, and oversee the Scheme, and these individuals will be referred to as "Corporate Manager Co-conspirators." Plaintiffs may seek to name these individuals as Defendants in an amended complaint.

CLASS ACTION COMPLAINT

## FACTUAL ALLEGATIONS

16. Defendant Buster, along with other Corporate Manager Co-conspirators, have conspired with the Plant Manager Defendants and the HR Clerk Defendants to approve and carry out the Scheme at Sanderson's Moultrie Plant, described more fully below. The Scheme saves Sanderson millions of dollars in labor costs because illegal aliens will work for extremely low wages, will typically not complain about workplace conditions and injuries, and because of their vulnerable situation, will accede to managers' demands to work harder than American citizens and legal aliens.

17. This is especially so in the chicken processing industry, which is known to operate on low-wage, mostly immigrant labor, including illegal immigrant labor, with extremely high turnover.

18. The Moultrie Plant is one of the largest employers in Colquitt County, Georgia. It employs over 1,500 workers.

19. The Defendants' Scheme subverts the law against knowingly hiring illegal aliens. This is done by directing the HR Clerk Defendants to falsely attest that illegal aliens have presented genuine work authorization documents that relate to the employee(s) tendering them, in order to facilitate their illegal employment. The HR Clerk Defendants are directed by their superiors, the Plant Manager Defendants, to accept these false documents and make these false attestations. The Plant Manager Defendants, are, in turn, directed by their superiors in Sanderson's corporate headquarters (in Laurel, Mississippi), including Corporate Manager Defendant Buster, to conduct the Plant's hiring in this manner so as to ensure that hundreds of illegal aliens are hired and so that labor costs are kept very low. The Scheme emanates from the highest level of the Company down to the

HR Clerks at the Moultrie Plant who interview job applicants and carry out the hiring on a daily basis.

20. At the Moultrie Plant, the Scheme is carried out under the direction of Defendants Hauser, Black, and Croft, with the assistance of Defendants Perales, Fondon, A.C., and other unnamed HR Clerks (who succeeded the HR Clerk Defendants after they were terminated).   The HR Clerk Defendants (and their successors) are responsible for personally conducting the application, interview, hiring, and work authorization verification process for new hires, including the illegal aliens, and for falsely attesting that these illegal aliens' work authorization/identity documents are genuine and relate to them.

21. The HR Clerk Defendants report directly to Defendant Croft and the other Plant Manger Defendants about the hiring process, including the staffing needs and how the hiring process for hourly-paid workers is conducted.   Defendant Croft was the HR Manager at the Moultrie Plant until 2010.   During this time, she had authority over all hiring and firing decisions there and was responsible for training, supervising, and overseeing the HR Clerk's hiring practices.   From time to time, she also personally conducted the hiring as needed, including the hiring of illegal aliens.

22. The HR Clerk Defendants also report to Defendants Hauser and Black, who are part of the management of the Plant. As the Complex Manager and Deputy, respectively, they have final authority over all Moultrie Plant decisions. They have approved of the illegal hiring policies described above and below, and ensure that the Plant conducts hiring in accordance with the policies set forth by Buster and the other Corporate Manager Co-conspirators.

23. Defendants Hauser, Black, and Croft report directly to Buster and others in the corporate headquarters in Laurel, Mississippi.  Defendants Hauser, Black, and Croft are responsible for assisting Buster and the other Corporate Manager Co-conspirators in setting hourly wages for the Class which are depressed below what they would be absent the Scheme. Others are part of the conspiracy to facilitate the Scheme at the Moultrie Plant. Defendants Black, Hauser, and Croft have directed all of the Moultrie Plant's HR personnel, including the HR Clerk Defendants, to conduct hiring in the manner described below, which results in the constant and systematic employment of illegal aliens.

24. The Scheme subverts the law against knowingly hiring illegal aliens. The Scheme saves Sanderson millions of dollars in labor costs and is thus undertaken for financial advantage.   If the Defendants were not hiring large numbers of illegal aliens, Sanderson would have to pay the Plaintiffs and the Class significantly higher wages.   For this reason, the Scheme increases the profitability of Sanderson.

### The Plant's Hiring Policies

25. On information and belief, the Moultrie Plant opened in 2005.  In order to open the Plant and keep it operational going forward, the Defendants needed to initially staff the Plant and keep it fully running on a daily basis. Buster and the Corporate Manager Co-conspirators directed the Plant Manger Defendants to hire any person who could produce identification documents ("IDs") required by the Department of Homeland Security's ("DHS") Form I-9, Employment Eligibility Verification Form ("I-9" or "I-9 Form"), regardless of the whether the IDs looked real/genuine, and regardless of whether the IDs related to the person tendering them.  The Plant Manager Defendants then instructed the HR Clerk Defendants to conduct hiring in this manner, which they did.

26. As a result, during this time period, hundreds of illegal aliens were hired by the HR Clerk Defendants using IDs that were obviously fake, including: a) IDs with pictures that appeared to have been cut and pasted from another document and then re-laminated on the ID, making it feel thicker; b) photographs with images of more than one face; c) IDs issued from Mexico; and/or d) IDs which were not issued from the U.S. government or any State.  (This is a non-exhaustive list of common examples of fake/fraudulent documents.)

27. The vast majority of these same workers knew little or no English.

28. The HR Clerk Defendants hired these individuals despite their flagrant use of these fake/fraudulent documents, as well as unsupported claims of U.S. citizenship.

29. The nurses at the Moultrie Plant were responsible for conducting physicals for the newly hired workers.  In order to conduct the physicals (which included, among other things, a urine test), the nurses needed to see a picture ID.[2]  The Plant nurses frequently noticed that the IDs being used by these workers appeared to be obvious fakes, for the reasons stated above.

30. The Plant nurses raised their concerns and suspicions with the HR Clerk Defendants and Plant Manager Defendants.  For example, they discussed the issue with Defendants Perales, Fondon, and A.C.   Defendant Perales responded that she could "get a busload of Mexicans anytime they [Sanderson] needed them."  Defendant Fondon thought it was "funny" but irrelevant that so many of these workers could not speak English.  Defendant A.C. agreed that their IDs did not look real.

31. Defendants A.C., Perales, and Fondon are bilingual in both Spanish and English.

---

[2] The Nurses were not responsible for verifying work authorization.

32. The nurses also discussed these problems with the Plant Manager Defendants and Defendant Buster. Defendants Buster, Hauser, Black, and Croft all responded in the same general way: "It did not matter [that the IDs did not look real] as long as they passed the I-9 process." Defendant Hauser even commented on at least one occasion that "they [the individuals with bad IDs] were good workers."

33. Once hired, these illegal alien workers assumed a Sanderson pseudonym, which was used solely for employment purposes. However they were known to friends at the Plant by their real name. For example, there was an illegal alien worker who went by the name of "Vivian Flores" at the Plant, but her "real name" was "Arelly Ponce."

34. Supervisors openly talk about how they prefer "Mexican" workers because they believe they work harder. For example, George Ortiz, a supervisor on second shift, would frequently say: "I'd rather have Mexicans working than Americans." Rufus Conine, a supervisor in debone, would similarly say: "I'd rather have Mexicans working for me than Blacks or Whites, anytime."

35. In December 2008, DHS conducted an enforcement action at the Moultrie Plant, arresting at least 25 illegal alien workers (and which was reported in the local news).

36. A few days prior to this enforcement action, the Plant Manager Defendants circulated a list of illegal alien workers to floor supervisors. Afterwards, Hauser, Black, and other unnamed Plant supervisors/managers held at least one meeting to "tip off" illegal alien workers about the imminent raid. (At least one of these meetings was held in the Plant's orientation room after second shift the night or two before the actual raid.) The managers/supervisors in the meeting used walkie-talkies to request that the floor

supervisors send the workers who appeared on the list to the orientation room. Within a few minutes, 50-60 illegal aliens gathered in the meeting.

37. During this meeting, Shay Ward, one of the Plant's HR Managers, told the group of workers not to come into work on Friday (the day of the anticipated raid) if they did not have their paperwork in order. Paychecks were then distributed to each worker at the meeting, ahead of the normally scheduled Friday payday. Many workers who were at the meeting did not come to work on that Friday.

38. In the weeks and months following the DHS raid, Defendants Fondon and Perales were terminated by Sanderson for their role in hiring illegal aliens in order to give the illusion that the Company had a policy of following the law. But according to Perales, she was fired for following the directions she was given by her superiors.

39. On information and belief, following the DHS raid, the Plant changed its hiring policies to prevent workers from using obviously fake IDs to get hired. But the intent was merely to continue the Scheme by making it harder for DHS to detect. During this time period, many of the illegal aliens who continued working at the Plant after the raid (but who were not arrested), were either terminated or stopped working. The Plant also hired more African-American workers in the short-run.

40. These changed policies reduced the number of illegal aliens working at the Plant (as compared with before the DHS raid). The Plant's use of E-verify (described below), however, still allowed the Defendants to hire a sizeable number of illegal aliens at the Plant, which could not run without illegal alien labor at depressed wage rates, while giving the illusion of immigration compliance.

### The Plant's Use of E-Verify

41. On information and belief, at some point during the relevant period, Buster and the Corporate Manager Co-conspirators decided to use DHS' E-Verify program (as well as other similar software programs) at the Plant for the reasons described above and below.

42. E-Verify, a voluntary internet verification program, only confirms that government-issued eligibility documents were actually issued and the name of the person to whom they were issued ("the issuee").  However, it does *not* establish that the person presenting the documents is, in fact, the issuee.   In other words, E-Verify does not prevent against identity theft or assuming a legal worker's identity.   Buster and the other Defendants know this.

43. When using E-verify, the person conducting hiring must still comply with the I-9 Form's verification requirement, regardless of whether the applicant "passes" E-Verify.  The I-9 Form requires the person conducting hiring to verify, under penalty of perjury, that the IDs appear genuine <u>and</u> relate to the employee presenting them, in order to confirm work authorization.

44. Accordingly, on information and belief, Buster instructs the Plant Manager Defendants to complete I-9 Form and to utilize the E-Verify Program, but not to check for, and/or to disregard signs of, identity theft, which Buster knows is not detected by the program. She instructs the Plant Managers to hire workers if their documents pass the program, regardless of other obvious facts indicating that the applicant is not really who they say they are, *i.e.*, are lying about their identity.

45. The Plant Manager Defendants in turn instruct the HR Clerk Defendants to complete the I-9 Forms and hire individuals despite information that the applicant is lying about their

identity/background/work authorization status and/or whose background information (as provided in the interview/application/new hire process) is plainly invalid and/or inconsistent on its face.

46. For example, an applicant using an Arkansas ID when the worker's application states he is from Mexico and lists no education, work history, or prior addresses in Georgia, is plainly using someone else's identity.   The same is true of the following: workers whose birth date on the application differs from the date on the tendered ID; workers who claim to live in Georgia for the past few years, but produce an out of state ID issued just days earlier; workers who have been previously employed at the Moultrie Plant under different names; and/or workers who cannot speak basic English, but claim to be U.S. Citizens. (This is a non-exhaustive list.)

47. On information and belief, during the new hire process, the Defendants coach illegal aliens to claim high numbers of dependents on their tax forms in order to reduce tax withholding as much as possible.

48. And once employed at Sanderson, the Plant's management and HR staff will "tip off" the illegal workers prior to any rumor of a government raid/audit to ensure that these workers are not arrested.  This will be done either explicitly or more subtly by telling the illegal alien workers to bring their IDs into work the next day.  On the days that DHS is rumored to be present, the Plant will be noticeably more empty and there will be less production.

49. These hiring policies have continued even after the HR Clerk Defendants' employment with Sanderson ended and they were succeeded by new HR Clerk employees. (Plaintiffs do not know the identity of the HR Clerk Defendants' successors).

## THE RICO PREDICATE ACTS COMMITTED BY THE INDIVIDUAL DEFENDANTS

### A. Use of False Attestations

50. The HR Clerk Defendants have personally violated 18 U.S.C. §§1546(a) and 1546(b)(3),

forms of racketeering activity pursuant to 18 U.S.C. §1961(1)(B), which state in pertinent

part:

> Whoever knowingly makes under oath, or as permitted under penalty of perjury
> under section 1746 of title 28, United States Code, knowingly subscribes as true,
> any false statement with respect to a material fact in any application, affidavit, or
> other document required by the immigration laws or regulations prescribed
> thereunder...

> Whoever uses— (3) a false attestation, for the purpose of satisfying a requirement
> of section 274A(b) of the Immigration and Nationality Act, shall be fined under
> this title, imprisoned not more than 5 years, or both.

51. When completing I-9 Forms for newly hired hourly-paid workers, the HR Clerk

Defendants routinely falsely attest, under penalty of perjury, the following:

> I attest, under penalty of perjury, that I have examined the document(s)
> presented by the above-named employee, that the above-listed
> document(s) appear to be genuine and to relate to the employee named,
> that the employee began employment on (*month/date/year*) _____ and
> that to the best of my knowledge the employee is authorized to work in the
> United States.

52. In the case of illegal aliens, this is a false attestation because the HR Clerk Defendants

know the documents presented are fake/fraudulent, for the reasons identified in ¶¶25-49,

*inter alia.*  Thus, these actions violate 18 U.S.C. §1546(a) and §1546(b)(3), RICO

predicate offenses.

53. These false attestations occur at the Moultrie Plant, by the HR Clerk Defendants

completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at

the time the I-9 Form is completed for each unauthorized alien (and noted by the date on

the I-9 Form), and in the presence of the unauthorized alien on whose behalf the HR

Clerk Defendant is falsely attesting.  On information and belief, these I-9 Forms are then

kept in the HR office of the Moultrie Plant.

54. The HR Clerk Defendants, and their successors (as directed by their superiors), have

personally violated §§1546(a) and 1546(b)(3) in this manner hundreds of times since

2008.  These violations committed by HR Clerk Defendants and their successors have

been ongoing since 2008, are continuous, open-ended, and will not stop without judicial

intervention.

**B. Acceptance, Receipt, Obtaining, and Use of Fake and/or Fraudulent Documents**

55. The HR Clerk Defendants have also personally violated 18 U.S.C. §1546(a), 18 U.S.C.

§§1546(b)(1)-(b)(2), 18 U.S.C. §1028(a)(7), and 18 U.S.C. §1028(f), other forms of

racketeering activity pursuant to 18 U.S.C. §1961(1)(B).

56.  1546(a) states, in pertinent part:

> Whoever knowingly…uses, attempts to use, possesses, obtains, accepts, or
> receives any such visa, permit, border crossing card, alien registration receipt
> card, or other document prescribed by statute or regulation for entry into or as
> evidence of authorized stay or employment in the United States, knowing it to be
> forged, counterfeited, altered, or falsely made, or to have been procured by means
> of any false claim or statement, or to have been otherwise procured by fraud or
> unlawfully obtained…

57. Sections 1546(b)(1) and (2) state, in pertinent part:

> Whoever uses—(1) an identification document, knowing (or having reason to
> know) that the document was not issued lawfully for the use of the possessor, [or]
> (2) an identification document knowing (or having reason to know) that the
> document is false…

58. Section 1028(a)(7) states, in pertinent part:

> Whoever…(a)(7) knowingly transfers, possesses, or uses, without lawful
> authority, a means of identification of another person with the intent to commit, or

to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law;

59. Section 1028(f) states:

Any person who attempts or conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

60. The HR Clerk Defendants routinely accept, receive, obtain, and use fake and fraudulent identification and work authorization documents (including but not limited to alien registration cards, drivers licenses, state IDs and social security cards) as part of the process of completing I-9 Forms and verifying work authorization, knowing that these documents were not issued legally for use by the possessor, for the reasons identified in ¶¶25-49, *inter alia*. Thus, these actions violate 18 U.S.C. §§1546(a), (b)(1), (b)(2), and 18 U.S.C. §§1028(a)(7) and (f).

61. The acceptance, receipt, obtaining, and/or usage of fake and fraudulent identification and work authorization documents during the new hire process occurs in the Moultrie Plant, by the HR Clerk Defendants completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at the time the I-9 Form is completed for each unauthorized alien (as noted by the date on the I-9 Form), and in the presence of the unauthorized alien on whose behalf the HR employee is falsely attesting. On information and belief, copies of these fake and fraudulent identification and work authorization documents are then kept in the Moultrie Plant's HR office.

62. The HR Clerk Defendants, and their successors (as directed by their superiors), have personally violated §§1546(a), (b)(1), (b)(2), 18 U.S.C. §§1028(a)(7) and (f), in this manner hundreds of times since 2008. These violations committed by HR Clerk

Defendants and their successors have been ongoing since 2008, are continuous, open-ended, and will not stop without judicial intervention.

## C.  Employment of 10 Unauthorized Aliens Per Year

63. The HR Clerk Defendants have personally violated 8 U.S.C. §1324(a)(3)(A), a form of racketeering under 18 U.S.C. §1961(1)(F), which states, in pertinent part:

> Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens...who [are]...unauthorized...and [have] been brought into the United States in violation of this subsection.

64. The HR Clerk Defendants personally conduct the application, interview, hiring, and work authorization verification process for new hires.  As such, they have personally violated this statute by hiring illegal aliens in the manner described above in ¶¶25-49.

65. Specifically, since 2008, they have personally hired hundreds of workers (and more than ten per year, each) with actual knowledge that the workers were unauthorized for employment, used fraudulent identity documents that did not pertain/relate to them, and had been brought into the country with the assistance of others on their illicit journey sneaking across the dangerous U.S.-Mexico border to their final destination in the U.S. (in locations other than border towns, including states that are not on the U.S.-Mexico Border, such as Georgia), and in obtaining fake/false identity documents once here.

66. The HR Clerk Defendants, and their successors (as directed by their superiors), have personally violated §1324(a)(3)(A) in this manner hundreds of times since 2008.  These violations committed by HR Clerk Defendants and their successors have been ongoing since 2008, are continuous, open-ended, and will not stop without judicial intervention.

## COUNT I AGAINST THE INDIVIDUAL RICO DEFENDANTS
## FOR VIOLATIONS OF 18 U.S.C. §1962(d)
## (Conspiracy to Violate Federal RICO Against the HR Clerk Defendants,
## the Plant Manager Defendants, and Defendant Buster)

67. The preceding paragraphs are incorporated herein as though set forth in full.

68. In agreeing to the objectives of the Scheme, each of the Individual RICO Defendants violated 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c) and by conspiring to commit the racketeering activity described above.

69. Each of the Individual RICO Defendants constitutes a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

70. At all relevant times, Sanderson was a corporation operated by the Individual RICO Defendants, which affected interstate commerce.  As such, it is a RICO enterprise pursuant to 18 U.S.C. §1961(4).

71. Each Individual RICO Defendant was responsible for carrying out their respective objectives in the Scheme, as detailed below.

72. The HR Clerk Defendants are responsible for conducting the actual hiring and work authorization verification of the illegal aliens, which violates 18 U.S.C. §1546(a), 18 U.S.C. §§(b)(1)-(3),  18 U.S.C. §§1028(a)(7), (f), and 8 U.S.C. §1324(a)(3)(A), which are made RICO predicate acts by 18 U.S.C. §§1961(1)(B) and (F).

73. The Plant Manager Defendants are responsible for instructing, supervising, and overseeing the HR Clerk Defendants and the day-to-day hiring at the Plant, which includes the hiring of illegal aliens in the manner described above.

74. The HR Clerk Defendants report to the Plant Manager Defendants about all hiring/staffing issues at the Plant.  The Plant Manager Defendants know that the HR Clerk Defendants hire large numbers of illegal aliens because that is the goal of the hiring

policy.  Additionally, they are stationed at the Plant, frequently walk around the Plant floor, and can observe the large number of illegal, Spanish speaking workers.  They also know which employees to tip-off before any rumor of a DHS enforcement action.   The Plant Manager Defendants have also been alerted to the illegal alien problem at the Plant by the staff nurses.   They approve of these hiring policies and procedures and have not stopped such practices.

75. The Plant Manager Defendants report directly to Buster and the Corporate Manager Co-conspirators about hiring practices and staffing issues at the Moultrie Plant.   Buster knows that the Moultrie Plant is staffed with a large number of illegal aliens because that is the goal of the hiring policy.  Additionally, although she works in the corporate office in Mississippi, she visits the Plant on a periodic basis to observe its operations and can see the large number of illegal, Spanish speaking workers.  She has also been alerted to the illegal alien problem at the Plant by the staff nurses.   Buster sets and approves of these hiring policies and procedures, and has not stopped such practices.

76. The Plant Manager Defendants also work closely with Buster and the Corporate Manager Co-conspirators to set depressed wage levels at the Moultrie Plant, which resulted in Plaintiff Simpson earning a starting wage of $8.50/hour in 2008 and an ending wage rate of $11.40/hour in 2010, and Plaintiff Roberts earning a starting wage rate of $8.50/hour in 2009 and an ending wage rate of $11.55/hour in 2010.  Members of the putative class have reported earning similar wages. Other than probationary wage increases for the first year and cost of living wage increases, raises were not given to putative class members.

77. Buster and the Plant Manager Defendants know that illegal aliens are willing to work in the dangerous and physically demanding conditions of a chicken processing plant for

these very low wages, such as the wage rates received by the Plaintiffs. Buster and the Plant Manager Defendants know that in order to attract an entire workforce of legally authorized individuals, they would need to raise the wages. But, because they can hire a large number of illegal aliens instead, they are able to keep wages lower than they otherwise would be.

78. Since at least 2008 (and earlier), the Individual Defendants have conspired to commit a pattern of racketeering activity in repeated violation of at least seven different RICO predicate acts, including: 18 U.S.C. §1546(a), 18 U.S.C. §1546(b)(1), 18 U.S.C. §1546(b)(2), 18 U.S.C. §1546(b)(3), 18 U.S.C. §1028(a)(7), 18 U.S.C. §1028(f), and 8 U.S.C. §1324(a)(3)(A). As a result, hundreds of acts of racketeering have been committed during this time. The Scheme is open and ongoing, and it will not stop without judicial intervention.

79. As a direct and proximate result of, and by reason of, the Individual Defendants' agreement to implement and carry out the Scheme at the Plant through Sanderson, the Plaintiffs have been injured in their business or property, within the meaning of 18 U.S.C. §1964(c).

80. The underlying predicate acts of the Scheme at Sanderson, the hiring of illegal aliens, the false attestation that the illegal aliens are presenting genuine work authorization/identity documents, and the acceptance/receipt/use of these fake documents, by themselves, are a substantial and direct factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain. No other party has been damaged by the Scheme.

81. The Individual Defendants are subject to joint and several liability for all of the damage caused by all the racketeering acts committed by any of their co-conspirators.

## COUNT II AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF GA. CODE. ANN., § 16-14-4(c)
### (Conspiracy to Violate Georgia RICO Against the HR Clerk Defendants, the Plant Manager Defendants, and Defendant Buster)

82. Plaintiffs incorporate the preceding paragraphs as though set forth in full.

83. The Individual Defendants have conspired to violate 18 U.S.C. §1546 and 18 U.S.C. §1028, which are made forms of "racketeering activity" by Ga. Code. Ann., §16-14-3(9)(A)(xxix). Section 16-14-3(9)(A)(xxix) incorporates the criminal statutes enumerated at 18 U.S.C. §1961(1)A-(D) as forms of "racketeering activity." 18 U.S.C. §1961(1)(B), as stated above, makes violations of 18 U.S.C. §1546 and 18 U.S.C. §1028, forms of "racketeering activity."

84. The conspiracy by the Individual Defendants, to violate Ga. Code Ann., §16-14-4(b), by participating in the Sanderson Farms, Inc. enterprise, as alleged above, violates Ga. Code Ann., §16-14-4(c).

85. These underlying predicate acts of the Scheme at Sanderson, by themselves, are a substantial and direct factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain. No other party has been damaged by the Scheme.

## COUNT III AGAINST THE HR CLERK DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. §1962(c)
### (Federal RICO Against HR Clerk Defendants AC, Perales, and Fondon)

86. The preceding paragraphs are incorporated herein as though set forth in full.

87. The HR Clerk Defendants violated 18 U.S.C. §1962(c) by personally committing a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §1546(a), 18 U.S.C. §1546(b)(1), 18 U.S.C. §1546(b)(2), 18 U.S.C. §1546(b)(3), 18 U.S.C. §1028(a)(7), 18 U.S.C. §1028(f), and 8 U.S.C. §1324(a)(3)(A), through their participation and operation of the Sanderson Enterprise described above.   They began their racketeering activity through this enterprise since at least 2008 and it is still open and ongoing.

88. As a direct and proximate result of, and by reason of, the HR Clerk Defendants' pattern of violations of these predicate acts, the Plaintiffs have been injured in their business or property, within the meaning of 18 U.S.C. §1964(c).

89. The underlying predicate acts of the Scheme at Sanderson, the hiring of illegal aliens, the false attestation that the illegal aliens are presenting genuine work authorization/identity documents, and the acceptance/receipt/use of these fake documents, by themselves, are a substantial and direct factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain.  No other party has been damaged by the Scheme.

## COUNT IV AGAINST THE HR CLERK DEFENDANTS
## FOR VIOLATIONS OF GA. CODE ANN., §16-14-4(b)
### (Georgia RICO Against HR Clerk Defendants AC, Perales, and Fondon)

90. The preceding paragraphs are incorporated herein as though set forth in full.

91. As described above, the HR Clerk Defendants have personally violated 18 U.S.C. §1546 and 18 U.S.C. §1028, which are made forms of "racketeering activity" by Ga. Code Ann., §16-14-3(9)(A)(xxix).

92. By their pattern of these violations of 18 U.S.C. §1546 and 18 U.S.C. §1028, the HR Clerk Defendants have personally violated Ga. Code Ann., §16-14-4(b), which makes it illegal for a person "employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

93. The enterprise in this count is Sanderson Farms, Inc.

94. These predicate acts, by themselves, are a substantial and direct factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain.  No other party has been damaged by the Scheme.

### COUNT V AGAINST THE PLANT MANAGER DEFENDANTS AND BUSTER FOR VIOLATIONS OF 18 U.S.C. § 1962(c) (Federal RICO Against Defendants Hauser, Black, Croft and Buster)

95. The preceding paragraphs are incorporated herein as though set forth in full.

96. The Plant Manager Defendants and Defendant Buster violated 18 U.S.C. §1962(c) by personally committing a pattern of racketeering activity, consisting of repeated and continuous violations of §1028(f), through their participation and operation of the Sanderson Enterprise.

97. By agreeing  and working with the HR Clerks to accept, receive, obtain, and use fake/fraudulent documents to satisfy the employer requirements during the I-9 process (violations of §1028(a)(7)), the Plant Manager Defendants and Defendant Buster have personally violated 18 U.S.C §1028(f).  Section 1028(f) makes it a crime to conspire in the commission of §1028(a)(7) violations, and is itself, a RICO predicate act.

98.  As a direct and proximate result of, and by reason of, the Plant Manager Defendants' and Defendant Buster's violations of 18 U.S.C. §1028(f) through Sanderson, the Plaintiffs

have been injured in their business or property, within the meaning of 18 U.S.C. §1964(c).

99. This predicate act, by itself, is a substantial and direct factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain.  No other party has been damaged by the Scheme.

## COUNT VI AGAINST THE PLANT MANAGER DEFENDANTS AND BUSTER FOR VIOLATIONS OF GA. CODE ANN., §16-14-4(b) (Georgia RICO Against Defendants Hauser, Black, Croft, and Buster)

100.    The preceding paragraphs are incorporated herein as though set forth in full.

101.    As described above, the Plant Manager Defendants and Defendant Buster have personally violated 18 U.S.C. §1028(f), which is made a form of "racketeering activity" by Ga. Code. Ann., §16-14-3(9)(A)(xxix).

102.    By their pattern of violations of 18 U.S.C. § 1028(f), the Plant Manager Defendants and Defendant Buster have violated Ga. Code. Ann., §16-14-4(b), which makes it illegal for a person "employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

103.    The enterprise in this count is Sanderson Farms, Inc.

104.    These predicate acts, by themselves, are a substantial and direct factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain.  No other party has been damaged by the Scheme.

## COUNT VII AGAINST DEFENDANT SANDERSON FARMS, INC.
## FOR VIOLATIONS OF GA. CODE ANN., §16-14-4(a)
### (Georgia RICO Against Defendant Sanderson Farms, Inc.)

105.     Plaintiffs incorporate the preceding paragraphs as though set forth in full.

106.     Sanderson has violated Ga. Code Ann., §16-14-4(a), which states:

>        It is unlawful for any person, through a pattern of racketeering activity or
>        proceeds derived therefrom, to acquire or maintain, directly or indirectly,
>        any interest in or control of any enterprise, real property, or personal
>        property of any nature, including money.

107.     Sanderson Farms, Inc., through the involvement of the Plant Manager Defendants

and Defendant Buster, has committed the Scheme.  As described above, the Scheme

violates Ga. Code Ann., §16-14-3(9)(A)(xxix), which incorporates  the criminal statutes

enumerated at 18 U.S.C. §1961(1)A-(D) as forms of "racketeering activity."  18 U.S.C.

1961(1)(B) makes violations of 18 U.S.C. §1546 and 18 U.S.C. §1028 forms of

"racketeering activity."

108.     As described above, the Scheme saves Sanderson Farms, Inc. millions of dollars

each year in labor costs.  Defendant Sanderson Farms, Inc. therefore, has violated §16-

14-4(a) of Georgia RICO by deriving money from the racketeering activity.

## CLASS ALLEGATIONS

109.     This action is brought and may be maintained as a class action pursuant to Fed. R.

Civ. P. 23(b)(2) and (3).  Plaintiffs bring this action on behalf of themselves, and all other

persons legally authorized to be employed in the U.S., who have been employed at the

Moultrie Plant as hourly wage earners in the four years prior to the filing of this case

("the Class" or "Class Members") and up through trial.

110.     The Class is so numerous that joinder of all Class Members is impracticable.  The

actual number can be ascertained through discovery of Sanderson's records, but is in the

hundreds or thousands.

111.     Among the questions of fact and law that are common to the Class are:

a.   Whether Defendants have been and are currently engaged in the Illegal Hiring
Scheme in order to depress wages of the Class in violation of 18 U.S.C. §1546
(and certain subparts), 18 U.S.C. §1028 (and certain subparts), and 8 U.S.C.
§1324(a)(3)(A)?;

b.   Whether the Individual Defendants conspired with each other to carry out the
Scheme at Sanderson?;

c.   Whether the Individual Defendants have committed the Scheme through the
Sanderson enterprise?;

d.   Whether the individual illegal acts comprising the Scheme constitute a "pattern of
racketeering activity" as required by RICO and Georgia RICO?;

e.   Whether the Defendants violated RICO and Georgia RICO laws?; and

f.   Whether, and to what extent, the Scheme has caused Class Members' wages to be
depressed?

112.     Plaintiffs' claims are typical of those of the members of the Class inasmuch as

their damages were directly and proximately caused by the Scheme.  Plaintiffs seek no

relief that is antagonistic or adverse to other Class members.

113.     Plaintiffs are committed to the vigorous prosecution of this action and have

retained counsel who are competent in the prosecution of RICO cases generally, and this

legal theory in particular.  Accordingly, they and their counsel will fairly and adequately

protect and represent the interests of the Class.

114.     Questions of law or fact that are common to the members of the Class are

substantially similar and predominate over any questions affecting only individual Class

members, and a class action is the superior method for the fair and efficient adjudication of this controversy.

115.     Plaintiffs anticipate no difficulty in the management of this action because the evidence proving the Illegal Hiring Scheme is ascertainable through discovery, and the identities of the Class Members are known to the Defendants. Damages can be calculated through expert testimony.

## PRAYER FOR RELIEF

116.     WHEREFORE, Plaintiffs request their appointment as Class representatives and demand judgment and other relief, as follows:

    a.  Certification of all Counts pursuant to Fed. R. Civ. P. 23(b)(2), for injunctive relief, and (b)(3), for money damages, appointment of Foster PC as class counsel, and appointment of Langley & Lee, LLP as additional counsel;

    b.  Judgment in an amount equal to three times the damages caused to the Class by the Defendants' racketeering activity pursuant to 18 U.S.C. § 1964(c) and Ga. Code Ann., §16-14-6(c);

    c.  For appropriate attorney's fees, pursuant to 18 U.S.C. §1964 and Ga. Code Ann., §16-14-6(c);

    d.  For the costs of this action;

    e.  For a jury trial;

    f.  For preliminary and permanent injunctions against the Defendants from perpetrating further racketeering activity pursuant to 18 U.S.C. §1964(c) and Ga. Code Ann., §16-14-6 and from employment in the poultry processing industry;

    g.  For the revocation of Sanderson Farms Inc.'s license to conduct business in Georgia  pursuant to Ga. Code Ann., §16-14-6(a)(4); and

117.     For any other relief the Court deems just and proper.


Dated February 16, 2012

LANGLEY & LEE, LLC

By: _____

Joseph P. Durham, Jr.
Georgia Bar No. 235524
Post Office Box 607
Albany, GA 31702-0607
(229) 431-3036


FOSTER, P.C.

By: _____

Matthew Galin
150 N. Wacker Dr., Ste 2150
Chicago, Illinois 60606


By: _____

Howard W. Foster
150 N. Wacker Dr., Ste 2150
Chicago, Illinois 60606
(Request for Pro Hac Admission
forthcoming)