**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **MELISSA SIMPSON and SABRINA ROBERTS on behalf of themselves and all those similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**SANDERSON FARMS, INC., PERRY HAUSER, JEFF BLACK, DEMISHIA CROFT, ARISTIDES CARRAL-GOMEZ, JANIE PERALES, KARINA FONDON, and JENNIFER HARRISON BUSTER,**<br><br>Defendants. | Civil Action No. 7:12-CV-28 (HL) |

**ORDER**

This case is before the Court on a Motion to Dismiss (Doc. 41) filed by

Defendants Sanderson Farms, Inc., Perry Hauser, Jeff Black, Demishia Croft,

and Jennifer Harrison Buster.[1] For the reasons discussed herein, the motion is

granted, but Plaintiffs will be given leave to amend their complaint.

**I.    BACKGROUND**

This is a putative class action suit brought under the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and the

---

[1] The five moving Defendants will be referred to collectively as "Defendants" for purposes of this Order. Defendants Perales, Fondon, and Carral-Gomez did not file a motion to dismiss.

Georgia RICO Act, O.C.G.A. § 16-14-1, *et seq.* ("Georgia RICO"). Plaintiffs commenced this action on behalf of all hourly-paid workers, legally authorized to be employed in the United States, who have been employed at the Sanderson Farms processing facility in Moultrie, Georgia since 2008. Plaintiffs allege that all of the Defendants have conspired to depress, and have in fact depressed, the wages paid to the hourly workers by knowingly employing large numbers of illegal aliens and by falsely attesting that the illegal aliens presented genuine work authorization documentation or identification documents.

Plaintiffs have sued Sanderson Farms, the corporate employer; Perry Hauser, the complex manager of the Moultrie plant until 2011; Jeff Black, the assistant plant manager of the Moultrie plant until 2010 or 2011; Demishia Croft, the human resources manager at the Moultrie plant from 2008 to 2010; Aristides Carral-Gomez, a human resources clerk at the Moultrie plant from 2008 to 2010; Janie Perales, a human resources clerk at the Moultrie plant until 2009; Karina Fondon, a human resources clerk at the Moultrie plant until 2009; and Jennifer Harrison Buster, the current corporate human resources manager at the Sanderson Farms corporate headquarters, located in Mississippi.[2]

---

[2] Plaintiffs group the Defendants together as follows in their complaint: Defendants Hauser, Black, and Croft are referred to as the "Plant Manager Defendants;" Defendants Carral-Gomez, Perales, and Fondon are referred to as the "HR Clerk Defendants;" and Defendant Buster is referred to as the "Corporate Manager Defendant." The Court uses these groupings where appropriate.

Plaintiffs' complaint contains seven counts. Count I is a federal RICO conspiracy claim under 18 U.S.C. § 1962(d). Count II is a Georgia RICO conspiracy claim under O.C.G.A. § 16-14-4(c). Counts III and V are federal RICO claims against certain Defendants. Counts IV and VI are Georgia RICO claims against certain Defendants. Count VII is a Georgia RICO claim against Defendant Sanderson Farms.

Defendants have now moved to have the complaint dismissed in its entirety. Defendants argue that Plaintiffs have not sufficiently pled their allegations as required by Federal Rule of Civil Procedure 8, <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and further have not properly alleged fraud as required by Federal Rule of Civil Procedure 9(b) where applicable. Defendants also contend that Plaintiffs' complaint fails to establish proximate cause. Finally, Defendants argue that the state RICO claims should be dismissed because the federal RICO claims cannot stand.[3]

Although the Court ultimately finds that the complaint fails because it does not establish proximate cause, since Plaintiffs will be allowed to amend, the Court will examine each alleged predicate act and determine whether the

---

[3] The Georgia RICO provisions are modeled after the federal provisions, and the same analysis is generally applied to both. *See* <u>Morast v. Lance</u>, 631 F.Supp. 474, 481 (N.D. Ga. 1986), *aff'd*, 807 F.2d 926 (11th Cir. 1987). As the Georgia RICO claims are based on the same predicate acts as the federal RICO claims, if the Court finds that Plaintiffs have not stated a claim under a particular predicate act, the Georgia RICO claims based on that predicate act fail.

complaint as it currently stands provides sufficient factual support for the predicate act.

## II.   STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the facial sufficiency of a complaint. When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the plaintiff's complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009).

Under Rule 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court held in Twombly that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

550 U.S. at 555 (internal quotations, citations, and alterations omitted). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (quotations and citations omitted). To avoid dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id. at 570.

4

The Supreme Court went one step further in Iqbal, holding that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. In considering a motion to dismiss, the court should "(1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 566 U.S. at 679). The court may also "infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.'" Id. (quoting Iqbal, 556 U.S. at 682).

In addition, a civil RICO claim based on predicate acts of fraud must comply not only with the standards set forth in Twombly and Iqbal, but also with the Rule 9(b) heightened pleading standard, which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b); see also Am. Dental, 605 F.3d at 1291; Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309, 1316-17 (11th Cir. 2007) ("To satisfy the Rule 9(b) standard, RICO complaints must

allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud.")

## III.   DISCUSSION

Under RICO, it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

To establish a prima facie civil RICO claim, a plaintiff must allege: (1) a substantive predicate violation of 18 U.S.C. § 1962; (2) injury to his business or property; and (3) a causal connection between the racketeering activity and the injury. Avigan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). To establish a substantive violation of § 1962, a plaintiff must show: (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Edwards v. Prime, Inc., 602 F.3d 1276, 1291-92 (11th Cir. 2010) (quotations and citations omitted).[4] A "pattern of racketeering activity" "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5); Edwards, 602 F.3d at 1292. To successfully allege

---

[4] Sanderson Farms is the alleged RICO enterprise in the federal counts.

a pattern of racketeering activity, a plaintiff must allege the commission of two or more predicate acts within a ten-year time span that are related to each other and which amount or pose a threat of continued criminal activity. Am. Dental, 605 F.3d at 1290-91. "An act of racketeering is commonly referred to as a 'predicate act.'" Edwards, 602 F.3d at 1292. The long list of RICO predicate acts is found in 18 U.S.C. § 1961. In addition, a plaintiff in a civil RICO action must also satisfy the requirements of § 1964(c), which requires (1) a showing of an injury to "business or property," and (2) that such injury was "by reason of" the substantive RICO violation. 18 U.S.C. § 1964(c).

Plaintiffs base their RICO claims on violations of 18 U.S.C. § 1546(a) (relating to fraud and misuse of visas, permits, and other documents), 18 U.S.C. §§ 1546(b)(1)-(3) (same), 18 U.S.C. § 1028(a)(7) (relating to fraud and related activity in connection with identification documents), 18 U.S.C. § 1028(f) (same), and 8 U.S.C. § 1324(a)(3)(A) (knowingly hiring unauthorized workers who had been brought into the United States). The Court will now address each alleged predicate act.

## A.    8 U.S.C. § 1324(a)(3)(A)

One of the alleged predicate acts is a violation of 8 U.S.C. § 1324(a)(3)(A). That code section provides: "Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that

the individuals are aliens described in [§ 1324(a)(3)(B)] shall be fined under Title 18 or imprisoned for not more than 5 years, or both." 8 U.S.C. § 1324(a)(3)(A). The term "alien" refers to (1) "an unauthorized alien," as defined in § 1324a(h)(3), who (2) "has been brought into the United States in violation of [§ 1324(a)]." 8 U.S.C. § 1324(a)(3)(B).

> In support of the § 1324(a)(3)(A) claim, Plaintiffs allege as follows:

> > Specifically, since 2008, [the HR Clerk Defendants] have personally hired hundreds of workers (and more than ten per year, each) with actual knowledge that the workers were unauthorized for employment, used fraudulent identity documents that did not pertain/relate to them, and had been brought into the country with the assistance of others on their illicit journey sneaking across the dangerous U.S.-Mexico border to their final destination in the U.S. (in locations other than border towns, including states that are not on the U.S.-Mexico border, such as Georgia), and in obtaining fake/false identity documents once here.

(Compl., ¶ 65).

As recognized by the Eleventh Circuit in Edwards, 602 F.3d at 1276, the Fourth Circuit in Walters v. McMahen, 684 F.3d 435 (4th Cir. 2012), and the Second Circuit in Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc., 271 F.3d 374 (2d Cir. 2001), the illegal hiring predicate act has two mens rea elements, both of which must be present for there to be a violation. "First, a defendant must hire ten or more aliens within a 12-month period with actual knowledge that those aliens are not authorized to work in the United

States." <u>Walters</u>, 684 F.3d at 440 (citing <u>Edwards</u>, 602 F.3d at 1292-93). "Second, the defendant must have actual knowledge that the unauthorized aliens hired were brought into the country in violation of 8 U.S.C. § 1324(a)." <u>Id.</u> (citing <u>Edwards</u>, 602 F.3d at 1293; <u>Commercial Cleaning Servs.</u>, 271 F.3d at 387).

The Court finds that Plaintiffs have not sufficiently pled a violation of the illegal hiring predicate, specifically that the HR Clerk Defendants, or any of the Defendants for that matter, had actual knowledge that the aliens hired were brought into the country in violation of § 1324(a). It is not enough to make a conclusory allegation that the hiring clerks had "actual knowledge" that the aliens "had been brought into the country with the assistance of others." (Compl., ¶ 65). Plaintiffs have provided no factual support for the second element of the illegal hiring predicate act. The complaint in <u>Walters</u> contained the exact same allegations for the illegal hiring claim as those present in the complaint before the Court. As noted by the Fourth Circuit in <u>Walters</u>, the allegations set forth by Plaintiffs "merely recast[ ] the language of 8 U.S.C. § 1324(a)(3), and provide[ ] no factual basis to support the statement that hiring clerks had 'actual knowledge' that the unauthorized aliens 'had been brought into the country with the assistance of others.'" <u>Walters</u>, 684 F.3d at 442. The Court finds the <u>Walter</u>

opinion persuasive, and finds that Plaintiffs have not sufficiently alleged a violation of the illegal hiring predicate.[5]

### B.      18 U.S.C. §§ 1028(a)(7) and (f)

Plaintiffs allege that the HR Clerk Defendants have personally violated 18 U.S.C. §§ 1028(a)(7) and (f), which are RICO predicate offenses.

Section 1028(a)(7) states that:

> Whoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law; . . . shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 1028(a)(7).

Section 1028(f), the companion conspiracy statute, provides that "[a]ny person who attempts or conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1028(f).

In their complaint, Plaintiffs allege the following in support of their §§ 1028(a)(7) and (f) claims:

---

[5] Plaintiffs similarly fail to state a claim under § 1324 as relates to their Georgia RICO claims.

The HR Clerk Defendants routinely accept, receive, obtain, and use fake and fraudulent identification and work authorization documents (including but not limited to alien registration cards, drivers licenses, state IDs and social security cards) as part of the process of completing I-9 Forms and verifying work authorization, knowing that these documents were not issued legally for use by the processor, for the reasons identified in ¶¶25-49, *inter alia.* Thus, these actions violate 18 U.S.C. §§1546(a), (b)(1), (b)(2), and 18 U.S.C. §§1028(a)(7) and (f).

The acceptance, receipt, obtaining, and/or usage of fake and fraudulent identification and work authorization documents during the new hire process occurs in the Moultrie Plant, by the HR Clerk Defendants completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at the time the I-9 Form is completed for each unauthorized alien (as noted by the date on the I-9 Form), and in the presence of the unauthorized alien on whose behalf the HR employee is falsely attesting. On information and belief, copies of these fake and fraudulent identification and work authorization documents are then kept in the Moultrie Plant's HR office.

(Compl., ¶¶ 60-61).

Defendants contend that Plaintiffs fail to state a claim under § 1028. Subsection (a)(7) creates liability for anyone who knowingly transfers, possesses, or uses a means of identification of another person.[6] Plaintiffs

---

[6] Section 1028(d)(7) defines "means of identification" in pertinent part as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any - - (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number; . . ." 18 U.S.C. § 1028(d)(7).

acknowledge their only contention under § 1028(a)(7) is that the HR Clerk Defendants use the fake IDs during the hiring process.

Defendants argue that the allegedly fake documents are not "used" by the employer. Instead, they are used by the employee to satisfy the employee's obligation to establish work eligibility. Defendants further contend that the complaint does not state a Twombly or Rule 9(b) compliant claim under § 1028. Because the predicate act is a fraud-based act, Defendants argue that Plaintiffs have to plead this claim with particularity and provide specific information about the documents presented, the types of documents involved, when the documents were presented and to whom, and why a particular document did not appear to be genuine or relate to the presenter - or in other words, the who, what, where, when, and why.

Plaintiffs first state in response that Rule 9 is inapplicable to their § 1028 claims because the claims do not sound in fraud. Plaintiffs state that the Mohawk courts "conclusively held" that false document violations do not sound in fraud and are not subject to Rule 9(b). *See* Williams v. Mohawk Indus., Inc., 314 F.Supp.2d 1333 (N.D. Ga. 2004) ("Mohawk I"). However, Defendants correctly point out that neither Mohawk II nor Mohawk III, which are the surviving appellate opinions, address whether Rule 9 applied to the asserted predicate acts. *See* Williams v. Mohawk Indus., Inc., 465 F.3d 1277 (11th Cir. 2006) ("Mohawk II");

12

Williams v. Mohawk Indus., Inc., 568 F.3d 1350 (11th Cir. 2009) ("Mohawk III"). The Court also points out that the plaintiffs in Mohawk did not make an allegation under § 1028. The Court declines to extend to the § 1028 claims in this case a determination by another district court that certain predicate acts do not sound in fraud.

In any event, Plaintiffs contend that even if Rule 9(b) does apply, they have made allegations sufficient to meet that standard. However, the Court finds that regardless of what standard is applied, Plaintiffs fail to state a claim on the merits under § 1028.

In response to Defendants' argument that the complaint does not show a violation of § 1028 because the employer does not use the fake IDs during the hiring process, but rather the employees do, Plaintiffs argue that the hiring clerks do in fact "use" the IDs, albeit temporarily, to certify the applicant is authorized for employment. Plaintiffs urge the Court to apply a broad definition of the term "use." Further, Plaintiffs argue that this issue has already been decided by the Mohawk courts, but the Court notes again that Mohawk did not involve a § 1028 claim, and the Court will not fold a § 1028 claim into Mohawk's analysis of a § 1546 claim. The Court does not agree that the Mohawk holding necessarily applies to § 1028.

Section 1028 prohibits identity theft. Other than <u>Mohawk</u>, which is not on point, Plaintiffs have not provided any support for their argument that § 1028 encompasses an employer using a document as part of a hiring process, and the Court has found none on its own. Plaintiffs have to allege something more than just the HR Clerk Defendants looked at the documents prior to completing an I-9 Form. Plaintiffs have not alleged that any of the Defendants have stolen any identity documents, and further have not alleged that any Defendants used the identification of another person without lawful authority. The Court finds that Plaintiffs have not stated a claim under § 1028(a)(7), and because the substantive claim fails, the § 1028(f) conspiracy claim fails as well.[7]

### C.   18 U.S.C. §§ 1546(a), (b)(1)-(b)(3)

Plaintiffs also contend that the HR Clerk Defendants violated 18 U.S.C. §§ 1546(a) and 1546(b)(1)-(3), which are predicate acts under 18 U.S.C. § 1961(1)(B). These code sections relate to false attestations and the fraudulent use of documents. Section 1546(a) provides in pertinent part:

> Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, . . .[s]hall be fined under this title or imprisoned. . . .

18 U.S.C. § 1546(a).

---

[7] Plaintiffs similarly fail to state a claim under § 1028 as relates to their Georgia RICO claims.

Section 1546(b) states:

> Whoever uses -
>
> (1)    an identification document, knowing (or having reason to know) that the document was not issued lawfully for the use of the possessor,
>
> (2)    an identification document knowing (or having reason to know) that the document is false, or
>
> (3)    a false attestation,
>
> for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 1546(b)(1)-(3).

Plaintiffs allege the following with regard to the false attestation violations under §§ 1546(a) and (b)(3):

> 51.    When completing I-9 Forms for newly hired hourly-paid workers, the HR Clerk Defendants routinely falsely attest, under penalty of perjury, the following:
>
>> I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (*month/date/year*) _____ and that to the best of my knowledge the employee is authorized to work in the United States.
>
> 52.    In the case of illegal aliens, this is a false attestation because the HR Clerk Defendants know the documents presented are fake/fraudulent, for the

reasons identified in ¶¶ 25-49, *inter alia*. Thus, these actions violate 18 U.S.C. § 1546(a) and § 1546(b)(3), RICO predicate offenses.

53.   These false attestations occur at the Moultrie Plant, by the HR Clerk Defendants completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at the time the I-9 Form is completed for each unauthorized alien (and noted by the date on the I-9 Form), and in the presence of the unauthorized alien on whose behalf the HR Clerk Defendant is falsely attesting. On information and belief, these I-9 Forms are then kept in the HR office of the Moultrie Plant.

(Compl., ¶¶ 51-53).

Specifically, Plaintiffs allege that when completing I-9 Forms for newly hired workers, the HR Clerk Defendants routinely made false attestations because they knew the documents being presented were fake or fraudulent.

Plaintiffs allege the following with regard to the acceptance, receipt, obtaining, and use of fake or fraudulent documents pursuant to § 1546(a)[8] and (b)(1)-(2)[9]:

---

[8] Plaintiffs also address the §1546 claims in their RICO interrogatories, and state as follows with regard to §§1546(a) and (b):

The HR Clerk Defendants are alleged to have personally violated 18 U.S.C. §1546(a) [and (b)], repeatedly, from 2008-2010, when they attest, under penalty of perjury, the following for illegal aliens:

I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (*month/date/year*) _____ and that to the best of my knowledge the employee is authorized to work in the United States. (Form I-9).

In the case of illegal aliens, this is a false attestation because the HR Clerk Defendants know the documents presented are fake/fraudulent, for the reasons stated above (in response 1(a)). These violations occur every time an I-9 Form is completed for an illegal alien, which occurs on a weekly basis (if not more frequently). After the HR Clerk Defendants were terminated, it is alleged that other HR personnel committed these violations in the same manner, under the direction of the Plant Manager Defendants and Buster. These individuals are unnamed co-conspirators because Plaintiffs do not yet know their identities.

*****

Plaintiffs' Counsel does not believe that this predicate act is subject to Fed. R. Civ. P. 9(b), but nevertheless states that: these false attestations occur at the Moultrie Plant, by the HR Clerk Defendants/personnel completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at the time the I-9 Form is completed for each unauthorized alien on whose behalf the HR Clerk/HR Personnel is falsely attesting. On information and belief, these I-9 Forms are then kept in the HR office of the Moultrie Plant. The I-9 Forms, photocopies of supporting documents/IDs and applications are in the sole possession of Sanderson Farms, Inc. Plaintiffs do not have access to these documents, and therefore, cannot provide any more details under Rule 9(b).

(Doc. 1-1, pp. 7-8).

[9] Plaintiffs make the following allegations with regard to the §§ 1546(b)(1)-(2) claims in their RICO interrogatories:

The HR Clerk Defendants are alleged to have personally violated 18 U.S.C. §1546(b)(1) [and (2)], repeatedly, from 2008-2010, by accepting, receiving, obtaining, and using fake and fraudulent identification and work authorization documents (including but not limited to alien registration cards, drivers licenses, state IDs and social security cards) as part of the process of completing I-9 Forms and verifying work authorization, knowing that these documents were not issued legally for use by the processor, for the reasons stated above in Response 1(a). These violations occur every time an I-9 Form is completed for an illegal alien (when the illegal alien tenders fake IDs in connection with this process), which occurs on a weekly basis (if not more frequently). After the HR Clerk Defendants were terminated, it is alleged that other HR personnel committed these violations in the same manner, under the direction of the Plant Manager Defendants and Buster. These individuals are unnamed co-conspirators because Plaintiffs do not yet know their identities.

*****

Plaintiffs' Counsel does not believe that this predicate act is subject to Fed. R. Civ. P. 9(b), but nevertheless states that: these false attestations occur at the Moultrie Plant, by the HR Clerk Defendants/personnel completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at the time the I-9 Form is completed for each unauthorized alien (and noted by the date on the I-9 Form), and in the presence of the unauthorized alien on whose behalf the HR Clerk/HR Personnel is falsely attesting. On information and belief, these I-9 Forms are then kept in the HR office of the Moultrie Plant. The I-9 Forms, photocopies of supporting documents/IDs and applications are in

60. The HR Clerk Defendants routinely accept, receive, obtain, and use fake and fraudulent identification and work authorization documents (including but not limited to alien registration cards, drivers licenses, state IDs and social security cards) as part of the process of completing I-9 Forms and verifying work authorization, knowing that these documents were not issued legally for use by the processor, for the reasons identified in ¶¶25-49, *inter alia*. Thus, these actions violate 18 U.S.C. §§ 1546(a), (b)(1), (b)(2), and 18 U.S.C. §§ 1028(a)(7) and (f).

61. The acceptance, receipt, obtaining, and/or usage of fake and fraudulent identification and work authorization documents during the new hire process occurs in the Moultrie Plant, by the HR Clerk Defendants completing the I-9 Form (as indicated by the signature in Section 2 of the I-9 Form), at the time the I-9 Form is completed for each unauthorized alien (as noted by the date on the I-9 Form), and in the presence of the unauthorized alien on whose behalf the HR employee is falsely attesting. On information and belief, copies of these fake and fraudulent identification and work authorization documents are then kept in the Moultrie Plant's HR office.

(Compl., ¶¶ 60-61).

In the paragraphs referenced as establishing that the documents presented to the HR Clerk Defendants were fraudulent or fake, that Defendants were aware of that fact, that the documents were accepted and used anyway,

_____

the sole possession of Sanderson Farms, Inc. Plaintiffs do not have access to these documents, and therefore, cannot provide any more details under Rule 9(b).

(Doc. 1-1, pp. 8-9).

and that the HR Clerk Defendants made false attestations and fraudulently completed the I-9 forms, Plaintiffs allege that:

> 25. Buster and the Corporate Manager Co-conspirators directed the Plant Manager Defendants to hire any person who could produce identification documents ("IDs") required by the Department of Homeland Security's ("DHS") Form I-9, Employment Eligibility Verification Form ("I-9" or "I-9 Form"), regardless of whether the IDs looked real/genuine, and regardless of whether the IDs related to the person tendering them. The Plant Manager Defendants then instructed the HR Clerk Defendants to conduct hiring in this manner, which they did.

> 26. As a result, hundreds of illegal aliens were hired by the HR Clerk Defendants using IDs that were obviously fake, including: a) IDs with pictures that appeared to have been cut and pasted from another document and then re-laminated on the ID, making it feel thicker; b) photographs with images of more than one face; c) IDs issued from Mexico; and/or d) IDs which were not issued from the U.S. government or any State. (This is a non-exhaustive list of common examples of fake/fraudulent documents.)

> 27. The vast majority of these same workers knew little or no English.

> 28. The HR Clerk Defendants hired these individuals despite their flagrant use of these fake/fraudulent documents, as well as unsupported claims of U.S. citizenship.

> 29. The nurses at the Moultrie Plant were responsible for conducting physicals for the newly hired workers. In order to conduct the physicals (which included, among other things, a urine test), the nurses needed to see a picture ID. The Plant nurses frequently noticed that the

IDs being used by these workers appeared to be obvious fakes, for the reasons stated above.

30.    The Plant nurses raised their concerns and suspicions with the HR Clerk Defendants and Plant Manager Defendants. For example, they discussed the issue with Defendants Perales, Fondon, and [Carral-Gomez]. Defendant Perales responded that she could "get a busload of Mexicans anytime they [Sanderson] needed them." Defendant Fondon thought it was "funny" but irrelevant that so many of these workers could not speak English. Defendant [Carral-Gomez] agreed that their IDs did not look real.

32.    The nurses also discussed these problems with the Plant Manager Defendants and Defendants Buster. Defendants Buster, Hauser, Black, and Croft all responded in the same general way: "It did not matter [that the IDs did not look real] as long as they passed the I-9 process." Defendant Hauser even commented on at least one occasion that "they [the individuals with bad IDs] were good workers."[10]

33.    Once hired, these illegal alien workers assumed a Sanderson pseudonym, which was used solely for employment purposes. However they were known to friends at the Plant by their real name. For example, there was an illegal alien worker who went by the name of "Vivian Flores" at the Plant, but her "real name" was "Arelly Ponce."

41.    On information and belief, at some point during the relevant period, Buster and the Corporate Manager Co-conspirators decided to use DHS' E-Verify program (as well as other similar software programs) at the Plant for the reasons described above and below.

---

[10] Plaintiffs state in their RICO interrogatory responses that a plant nurse has signed a sworn statement detailing her encounters with all Defendants where she confronted them about the immigration issues. (Doc. 1-1, p. 14). This sworn statement has not been provided to the Court or presumably to any Defendant.

43.    When using E-Verify, the person conducting hiring must still comply with the I-9 Form's verification requirement, regardless of whether the applicant "passes" E-Verify. The I-9 Form requires the person conducting hiring to verify, under penalty of perjury, that the IDs appear genuine and relate to the employee presenting them, in order to confirm work authorization.

44.    Accordingly, on information and belief, Buster instructs the Plant Manager Defendants to complete I-9 Form[ ] and to utilize the E-Verify Program, but not to check for, and/or to disregard signs of, identity theft, which Buster knows is not detected by the program. She instructs the Plant Managers to hire workers if their documents pass the program, regardless of other obvious facts indicating that the applicant is not really who they say they are, *i.e.*, are lying about their identity.

45.    The Plant Manager Defendants in turn instruct the HR Clerk Defendants to complete the I-9 Forms and hire individuals despite information that the applicant is lying about their identity/background/work authorization status and/or whose background information (as provided in the interview/application/new hire process) is plainly invalid and/or inconsistent on its face.

46.    For example, an applicant using an Arkansas ID when the worker's application states he is from Mexico and lists no education, work history, or prior addresses in Georgia, is plainly using someone else's identity. The same is true of the following: workers whose birth date on the application differs from the date on the tendered IDs; workers who claim to live in Georgia for the past few years, but produce an out of state ID issued just days earlier; workers who have been previously employed at the Moultrie Plant under different names; and/or workers who cannot speak basic English, but claim to be U.S. citizens. (This is a non-exhaustive list.)

(Compl., ¶¶ 25-30, 32-33, 41, 43-46).

Defendants argue that these predicate acts involve fraud and are subject to Rule 9(b)'s heightened pleading standard, but Plaintiffs have not alleged fraud with particularity. Plaintiffs, again relying on the <u>Mohawk</u> cases, argue that these allegations do not sound in fraud and are not subject to Rule 9(b). But as discussed *supra*, the surviving <u>Mohawk</u> opinions do not address whether Rule 9 applies to § 1546 claims or not. Thus, the Court will look elsewhere to decide this issue.

Section 1546 is entitled "Fraud and misuse of visas, permits, and other documents." 18 U.S.C. § 1546. The acts prohibited by this code section involve immigration document fraud, obtaining employment through fraudulent means, fraudulently completing immigration forms, and making fraudulent or false attestations on immigration forms. The Court has little trouble finding that the § 1546 claims are subject to Rule 9(b), as it is well-settled in the Eleventh Circuit that, when the racketeering activities alleged are predicated upon acts of fraud, the plaintiff must plead those predicate acts with the same particularity required by Rule 9(b). *See* <u>Ambrosia Coal</u>, 482 F.3d at 1316; <u>Am. Dental</u>, 605 F.3d at 1291 (mail and wire fraud); <u>Kivisto v. Miller, Canfield, Paddock & Stone, PLC</u>, 413 F.App'x 136, 139 (11th Cir. 2011) (mail fraud). The Southern District of Florida in <u>Magnifico v. Villanueva</u>, 783 F.Supp.2d 1217 (S.D. Fla. 2011), a post-<u>Mohawk</u> case, similarly found that § 1564 is governed by Rule 9(b).

Since Rule 9(b) applies to the § 1546 claims, Plaintiffs must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380-81 (11th Cir. 1997). Plaintiffs do not have to show reliance on the defendants' fraudulent misrepresentations or statements. Magnifico, 783 F.Supp.2d at 1228 (citing Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008)).

Defendants contend Plaintiffs have not satisfied the "who, what, when, where, and how" requirement for the § 1546 fraud claims. Defendants assert that the complaint must set forth the precise documents at issue, the date and circumstances of the claimed presentment, the identity of the employee, how and why the documents did not appear to be genuine or relate to the presenting employee, how and when the Defendants participated in the alleged activity, what the HR Clerk Defendants gained by the fraud, who directed the HR Clerk Defendants to commit the alleged acts, when the HR Clerk Defendants were so directed, or how the HR Clerks were directed. In response, Plaintiffs point to various paragraphs in the complaint, along with their RICO interrogatories, and state that the following:

Here, the false statements were made on the I-9 Form in the form of the attestation (¶51); by Perales, Fondon, and [Carral-Gomez] personally, at the Plant, as indicated by their individual signatures on the I-9 Form (not by the Plant Manager Defendants or Buster); on the date the aliens were hired (as indicated in Section 2 of the I-9 Form) (¶53); the statements were false because the HR Clerks knew the hired employee was not authorized to work in the U.S. and was using fake/fraudulent IDs for the reasons detailed in ¶¶25-49 (¶52); the HR Clerks were directed to do this by Croft, Black, and Hauser through training, instruction, and supervision (¶¶21-22, 73-74, Inter. 9); and the Defendants were able to sufficiently staff the Plant at sub-market wages, keeping Sanderson profitable (*see, e.g.*, ¶¶ 16, 23-24, 77).

(Doc. 56, p. 22). Plaintiffs further argue that because the fraudulent statements (the false attestations on the I-9 Forms) are in Defendants' sole possession, Rule 9(b) is relaxed and they are not required to produce every detail prior to discovery.

Defendants reply that these allegations are not sufficient to state a claim under Rule 9(b), and further that all of the information is not in their sole possession, as the ID documents presented to the HR Clerk Defendants remain in the possession of the employee.

Upon careful consideration and review, the Court finds that Plaintiffs have alleged violations of § 1546 sufficient under Rule 9(b) to withstand a Rule 12(b)(6) motion to dismiss. While Plaintiffs do not allege specific names of the alleged illegal workers, the Court does not believe such specificity is required at

this juncture. *See* <u>Walters</u>, 684 F.3d at 443 ("[W]e conclude that the plaintiffs' failure to identify any of the unauthorized aliens involved is not fatal to their amended complaint.") And while no specific dates are given, the Court tends to agree with Plaintiffs that there is no way they could know that information at this time since the I-9 Forms at issue are in Defendants' possession. Plaintiffs have provided sufficient information to apprise all of the Defendants of the facts supporting the § 1546 claims.[11]

### D.    18 U.S.C. § 1962(d)

Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate any provision of § 1962(a), (b), or (c) of RICO. "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." <u>Am. Dental</u>, 605 F.3d at 1293 (internal citation and quotation omitted). "A plaintiff need not offer direct evidence of a RICO agreement; the existence of a conspiracy 'may be inferred from the conduct of the participants.'" <u>Id.</u> (citation omitted).

Count I of the complaint contains the federal RICO conspiracy claim. Plaintiffs detail the conspiracy scheme as follows:

> 72.    The HR Clerk Defendants are responsible for conducting the actual hiring and work authorization verification of illegal aliens, which violates 18 U.S.C.

---

[11] Plaintiffs similarly have stated a claim under § 1546 as relates to their Georgia RICO claims.

§1546(a), 18 U.S.C. §§(b)(1)-(3), 18 U.S.C. §§ 1028(a)(7), (f), and 8 U.S.C. §1324(a)(3)(A), which are made RICO predicate acts by 18 U.S.C. §§1961(1)(B) and (F).

73.    The Plant Manager Defendants are responsible for instructing, supervising, and overseeing the HR Clerk Defendants and the day-to-day hiring at the Plant, which includes the hiring of illegal aliens in the manner described above.

74.    The HR Clerk Defendants report to the Plant Manager Defendants about all hiring/staffing issues at the Plant. The Plant Manager Defendants know that the HR Clerk Defendants hire large numbers of illegal aliens because that is the goal of the hiring policy. Additionally, they are stationed at the Plant, frequently walk around the Plant floor, and can observe the large number of illegal, Spanish speaking workers. They also know which employees to tip-off before any rumor of a DHS enforcement action. The Plant Manager Defendants have also been alerted to the illegal alien problem at the Plant by the staff nurses. They approve of these hiring policies and procedures and have not stopped such practices.

75.    The Plant Manager Defendants report directly to Buster and the Corporate Manager Co-conspirators about hiring practices and staffing issues at the Moultrie Plant. Buster knows that the Moultrie Plant is staffed with a large number of illegal aliens because that is the goal of the hiring policy. Additionally, although she works in the corporate office in Mississippi, she visits the Plant on a periodic basis to observe its operations and can see the large number of illegal, Spanish speaking workers. She has also been alerted to the illegal alien problem at the Plant by the staff nurses. Buster sets and approves of these hiring policies and procedures, and has not stopped such practices.

76.    The Plant Manager Defendants also work closely with Buster and the Corporate Manager Co-conspirators to set depressed wage levels at the Moultrie Plant, which resulted in Plaintiff Simpson earning a starting wage of $8.50/hour in 2008 and an ending wage rate of $11.40/hour in 2010, and Plaintiff Roberts earning a starting wage of $8.50/hour in 2009 and an ending wage rate of $11.55/hour in 2010. Members of the putative class have reported earning similar wages. Other than probationary wage increases for the first year and cost of living wage increases, raises were not given to putative class members.

77.    Buster and the Plant Manager Defendants know that illegal aliens are willing to work in the dangerous and physically demanding conditions of a chicken processing plant for these very low wages, such as the wage rate received by the Plaintiffs. Buster and the Plant Manager Defendants know that in order to attract an entire workforce of legally authorized individuals, they would need to raise the wages. But, because they can hire a large number of illegal aliens instead, they are able to keep wages lower than they otherwise would be.

78.    Since at least 2008 (and earlier), the Individual Defendants have conspired to commit a pattern of racketeering activity in repeated violation of at least seven different RICO predicate acts, including: 18 U.S.C. §1546(a), 18 U.S.C. §1546(b)(1), 18 U.S.C. §1546(b)(2), 18 U.S.C. §1546(b)(3), 18 U.S.C. §1028(a)(7), 18 U.S.C. §1028(f), and 8 U.S.C. §1324(a)(3)(A). As a result, hundreds of acts of racketeering have been committed during this time. The Scheme is open and ongoing, and it will not stop without judicial intervention.

(Compl., ¶¶ 72-78).

Plaintiffs provide the following factual allegations to support the federal RICO conspiracy claim outlined in Count I of the complaint:

> 16.   Defendant Buster, along with other Corporate Manager Co-conspirators, have conspired with the Plant Manager Defendants and the HR Clerk Defendants to approve and carry out the Scheme at Sanderson's Moultrie Plant, described more fully below. The Scheme saves Sanderson millions of dollars in labor costs because illegal aliens will work for extremely low wages, will typically not complain about workplace conditions and injuries, and because of their vulnerable situation, will accede to managers' demands to work harder than American citizens and legal aliens.

> 19.   The Defendants' Scheme subverts the law against knowingly hiring illegal aliens. This is done by directing the HR Clerk Defendants to falsely attest that illegal aliens have presented genuine work authorization documents that relate to the employee(s) tendering them, in order to facilitate their illegal employment. The HR Clerk Defendants are directed by their superiors, the Plant Manager Defendants, to accept these false documents and make these false attestations. The Plant Manager Defendants, are, in turn, directed by their superiors in Sanderson's corporate headquarters (in Laurel, Mississippi), including Corporate Manager Defendant Buster, to conduct the Plant's hiring in this manner so as to ensure that hundreds of illegal aliens are hired and so that labor costs are kept very low. The Scheme emanates from the highest level of the Company down to the HR Clerks at the Moultrie Plant who interview job applicants and carry out the hiring on a daily basis.

> 20.   At the Moultrie Plant, the Scheme is carried out under the direction of Defendants Hauser, Black, and Croft, with the assistance of Defendants Perales, Fondon, [Carral-Gomez], and other unnamed HR Clerks

(who succeeded the HR Clerk Defendants after they were terminated). The HR Clerk Defendants (and their successors) are responsible for personally conducting the application, interview, hiring, and work authorization verification process for new hires, including the illegal aliens, and for falsely attesting that these illegal aliens' work authorization/identity documents are genuine and relate to them.

21.    The HR Clerk Defendants report directly to Defendant Croft and the other Plant Manager Defendants about the hiring process, including the staffing needs and how the hiring process for hourly-paid workers is conducted. Defendant Croft was the HR Manager at the Moultrie Plant until 2010. During this time, she had authority over all hiring and firing decisions there and was responsible for training, supervising, and overseeing the HR Clerk's hiring practices. From time to time, she also personally conducted the hiring as needed, including the hiring of illegal aliens.

22.    The HR Clerk Defendants also report to Defendants Hauser and Black, who are part of the management of the Plant. As the Complex Manager and Deputy, respectively, they have final authority over all Moultrie Plant decisions. They have approved of the illegal hiring policies described above and below, and ensure that the Plant conducts hiring in accordance with the policies set forth by Buster and the other Corporate Manager Co-conspirators.

23.    Defendants Hauser, Black, and Croft report directly to Buster and others in the corporate headquarters in Laurel, Mississippi. Defendants Hauser, Black, and Croft are responsible for assisting Buster and the other Corporate Manager Co-conspirators in setting hourly wages for the Class which are depressed below what they would be absent the Scheme. Others are part of the conspiracy to facilitate the Scheme at the

Moultrie Plant. Defendants Black, Hauser, and Croft have directed all of the Moultrie Plant's HR personnel, including the HR Clerk Defendants, to conduct hiring in the manner described below, which results in the constant and systematic employment of illegal aliens.

24.    The Scheme subverts the law against knowingly hiring illegal aliens. The Scheme saves Sanderson millions of dollars in labor costs and is thus undertaken for financial advantage. If the Defendants were not hiring large numbers of illegal aliens, Sanderson would have to pay the Plaintiffs and the Class significantly higher wages. For this reason, the Scheme increases the profitability of Sanderson.

(Compl., ¶¶ 16, 19-24).

Plaintiffs then go on to allege that Buster and the Corporate Manager Co-conspirators directed the Plant Manager Defendants to hire any person who could produce an ID as required for an I-9 Form, regardless of whether the ID looked genuine and regardless of whether the ID related to the person tendering it. The Plant Manager Defendants then instructed the HR Clerk Defendants to conduct hiring in this manner. (Compl., ¶ 25). Plaintiffs allege that nurses raised concerns with the HR Clerk Defendants, Plant Manager Defendants, and Defendant Buster about fake IDs. (Compl., ¶¶ 29-30, 32). The Plant Manager Defendants and Defendant Buster are alleged to have "all responded in the same general way: 'It did not matter [that the IDs did not look real] as long as they passed the I-9 process.'" (Compl., ¶ 32). Allegations are made about supervisors preferring Mexican workers (Compl., ¶ 34), and about tip offs prior to a DHS raid

at the plant in December 2008. Plaintiffs allege that the Plant Manager Defendants circulated a list of illegal alien workers to floor supervisors and an HR Manager told the illegal workers not to come in the next day unless their paperwork was in order. (Compl., ¶¶ 36-37). Defendants Fondon and Perales were fired by Sanderson following the raid "in order to give the illusion that the Company had a policy of following the law. But according to Perales, she was fired for following the directions she was given by her superiors." (Compl., ¶ 38). Plaintiffs go on to allege in support of their conspiracy theory with regard to use of the E-Verify program that, on information and belief, Buster instructs the Plant Manager Defendants to complete I-9 Forms and utilize the E-Verify Program, but not to check for, or to disregard signs of, identity theft. She instructs the Plant Managers Defendants to hire workers if their documents pass the program, regardless if it appears they are lying about their identity. Then the Plant Manager Defendants instruct the HR Clerk Defendants to complete the I-9 Forms and hire individuals despite information that the applicant is lying about his identity. (Compl., ¶ 44-45).

As noted above, a RICO conspiracy can be established in one of two ways: "(1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate

acts." <u>Am. Dental</u>, 605 F.3d at 1293. The existence of a conspiracy "may be inferred from the conduct of the participants." <u>Id.</u> (citation omitted).

Defendants argue that the conspiracy claim fails mainly because the allegations do not meet the <u>Iqbal</u> standard as they are just conclusory statements, bare assertions, and recitations of a conspiracy claim. According to Defendants, Plaintiffs must do more than conclusorily allege that they "directed" others to do things or that Defendants "approved" the scheme.

Assuming the veracity of the statements contained in the complaint, which the Court must do at this point, along with the statements contained in Plaintiffs' RICO interrogatories,[12] the Court finds that Plaintiffs have made allegations

---

[12] *See* Resp. to Interrog. 9:

Plaintiffs allege a three-tiered conspiracy to hire illegal aliens and depress wage rates at the Plant. Each member in each tier of the conspiracy is responsible for carrying out certain functions in order to accomplish the goal of the conspiracy (hiring large numbers of illegal aliens to depress wage rates). The allegations in the complaint include the following:

- At the Plant level (the lowest level), the HR Clerk Defendants (and their unnamed co-conspirator successors) are the individuals who are hiring the illegal aliens, falsely attesting to their work authorization, and accepting/using/obtaining/receiving their fake IDs (*i.e.*, personally committing the predicate acts). The HR Clerk Defendants report directly to the Plant Manager Defendants (the middle tier) about all hiring and staffing issues.

- In the middle tier, the Plant Manager Defendants instruct/supervise/oversee/train the HR Clerk Defendants to conduct hiring in the manner described above. They approve of, and do not halt, such hiring practices. The Plant Manager Defendants report directly to Buster (the highest/corporate tier). The Plant Manager Defendants act as a liaison between the HR Clerk Defendants (at the Plant level) and Buster (at the Corporate level).

- At the highest tier (corporate level), Buster sets this hiring policy and instructs the Plant Manager Defendants to implement it at the Plant. Buster also works with the Plant Manager Defendants to set the Plant's wage levels at depressed levels, knowing that illegal aliens will work for low wages and knowing that in order to attract an entire workforce of legally authorized individuals, they would need to raise the wages.

sufficient to allow the inference of the existence of a conspiracy and have thus stated a claim under Rule 12(b)(6). The § 1962(d) conspiracy claim will not be dismissed.[13]

### E.     Proximate Cause

As noted at the beginning of this Order, to state a RICO claim pursuant to 18 U.S.C. § 1964, a plaintiff must allege three elements: (1) violation of § 1962; (2) injury to business or property; and (3) that the violation caused the injury. Avrigan, 932 F.2d at 1577 (citation omitted). The Court has already addressed the alleged § 1962 violations. As for the second and third prongs, the Supreme Court has interpreted this language as requiring a civil RICO plaintiff to establish that his alleged injury was proximately caused by the defendant's conduct. Hemi Group, LLC v. City of New York, N.Y., --- U.S. ---, 130 S.Ct. 983, 989, 175 L.Ed.2d 943 (2010); Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006).

Plaintiffs allege in their complaint that the illegal hiring scheme has injured their business or property and the predicate acts are a "substantial and direct

---

- The conspiracy has been ongoing since the Plant opened in 2005 and continues until the present.

- The object of the conspiracy is to hire a large number of illegal aliens in order to keep wages lower than they would otherwise be if the Plant was staffed with only legal workers.

(Doc. 1-1, pp. 12-13).

[13] Plaintiffs' Georgia state RICO conspiracy claim also survives.

factor in causing the depressed wages about which the Plaintiffs, and the other legally authorized hourly workers at Sanderson, complain. No other party has been damaged by the Scheme." (Compl., ¶ 80).

Defendants argue that Plaintiffs have not sufficiently alleged a direct injury or proximate cause. While the Court finds that Plaintiffs have alleged an injury to their business interests, the Court agrees with Defendants that Plaintiffs have not sufficiently alleged proximate cause. Civil RICO plaintiffs must prove that their injuries were proximately caused by the alleged RICO violation. *See* <u>Anza.</u>, 547 U.S. at 462 (holding that "a claim is cognizable under [18 U.S.C. ] § 1964(c) only if the defendant's alleged violation proximately caused the plaintiff's injury); <u>Holmes v. Sec. Investor Prot. Corp.</u>, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (same). This means Plaintiffs must show that their injuries were proximately caused by the alleged predicate acts. *See* <u>Anza</u>, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.") The Court has already determined that Plaintiffs have failed to state a claim with respect to their § 1324(a)(3)(A) and §§ 1028(a)(7) and (f) claims. Thus, for purposes of determining whether Plaintiffs have sufficiently alleged proximate cause, the Court will only consider the remaining predicate acts under §§ 1546(a) and (b)(1)-(3). This means Plaintiffs must sufficiently allege under

Twombly and Iqbal a link between the depressed wages and the § 1546 violations, in particular the I-9 Form false attestations.

Plaintiffs point to a string of cases, including Mohawk II, as conclusive support that they have sufficiently alleged proximate cause. *See* Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1170-71 (9th Cir. 2002); Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 618-21 (6th Cir. 2004); Commercial Cleaning Serv., LLC v. Colin Serv. Sys., Inc., 271 F.3d 374 (2d Cir. 2001). But overlooked or disregarded in all of Plaintiffs' briefs is that all of these cases were pre-Twombly and/or Iqbal. They were governed by a different, more lenient standard. Those cases simply have little precedential value.

In order to survive a motion to dismiss, Plaintiffs must plead facts showing or tending to show that Defendants' violations of the false attestation predicate and their acceptance of fake documents proximately caused depressed wages. As it stands now, Plaintiffs just conclusorily state that these predicate acts "are a substantial and direct factor in causing the depressed wages. . . ." (Compl., ¶¶ 80, 85, 89, 94, 99, 104). That is not sufficient. Thus, even though the Court found *supra* that Plaintiffs have alleged certain predicate act violations sufficient to survive the motion to dismiss, Plaintiffs have not met the proximate cause requirement. This causes the entire complaint to fail.

**IV.    CONCLUSION**

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss (Doc. 41). However, Plaintiffs will be given the opportunity to file an amended complaint to remedy the insufficiencies outlined in this Order. *See* <u>Welch v. Laney</u>, 57 F.3d 1004, 1009 (11th Cir. 1995) ("Where a more carefully drafted complaint might state a claim upon which relief could be granted, the district court should allow the plaintiff [an opportunity] to amend the complaint rather than dismiss it.") Should Plaintiffs decide to file an amended complaint, they will have until October 5, 2012 to file it.

**SO ORDERED**, this the 13th day of September, 2012.

<u>*s/ Hugh Lawson*</u>
**HUGH LAWSON, SENIOR JUDGE**

mbh

36